# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **RICKY L. PITTMAN,** | : | **Case No. 1:05 cv 0520** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **CUYAHOGA VALLEY** | : | <u>**ORDER**</u> |
| **CAREER CENTER**, *et al.*, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

This case involves, *inter alia*, claims of race discrimination filed against an employer and certain members of its administrative staff.  Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 1343, 2201 and 2202.[1]

Plaintiff Ricky L. Pittman (Pittman) brings suit against Cuyahoga Valley Career Center (CVCC), its Principal, Richard Rybak (Principal Rybak), and its Superintendent, Roscoe Schlachter (Superintendent Schlachter)(collectively, Defendants).  Pittman's Complaint asserts four causes of action stemming from Pittman's employment at CVCC.

Count I of the Complaint alleges race discrimination under federal law.  Count II of the Complaint alleges race discrimination in violation of Ohio state law.  Count III of the Complaint alleges wrongful termination in breach of an employment contract.  Finally, Count IV of the Complaint alleges the individual defendants, Superintendent Schlachter and Principal Rybak, were acting as state officials when they conspired to suppress Pittman's right to free speech.  Pittman seeks monetary damages and

---

[1]     Jurisdiction over various state law claims has been invoked under the doctrine of "pendant jurisdiction."  This doctrine is codified at 28 U.S.C § 1367.

reinstatement to a position of active employment.[2]

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 9).  For the reasons set forth below, Defendants' Motion is **<u>GRANTED</u>**.

### Background

The following facts are not in dispute.  CVCC is an Ohio Public School District that provides high school vocational education to its students.  The Board of Education for CVCC consists of nine members selected from the communities CVCC serves.  Principal Rybak and Superintendent Schlachter have worked in an administrative capacity for CVCC since 2000 and 2001, respectively.

Prior to the start of each school year, employees of CVCC are invited to an "Opening Day In-Service Session" at CVCC.  New faculty members are made aware of the Faculty Handbook, which contains the various school rules and regulations as adopted by the Board of Education.  Employees are also provided with a copy of CVCC's anti-harassment policies and reporting procedures.

Pittman is an African-American male who was a substitute teacher with CVCC for three years.  Pittman's immediate supervisor was Assistant Principal Huml.  As a CVCC employee, Pittman was aware of the school's Faculty Handbook - including the fact that CVCC had policies and procedures for the reporting of harassment, and that CVCC had rules regarding the early dismissal of students.  Pittman concedes he reviewed and understood the policies and rules contained in the Handbook, including: (1) a faculty member may report incidences of harassment to any member of the administration; (2) teachers

---

[2]      Paragraph 1 of Pittman's Complaint claims "[t]his is a proceeding for mandatory, declaratory and injunctive relief."  Paragraph 2 of the Complaint asserts the jurisdiction of the Court is invoked, in part, pursuant to 28 U.S.C. § 2201 and 2202 (the Declaratory Judgment Act).  Pittman has not, however, pled an action for declaratory or injunctive relief.  He claims he is seeking monetary damages and equitable relief in the form of reinstatement of employment, not an injunction or a declaratory judgment.

are prohibited from dismissing students early without prior approval from the administration; and, (3) teachers are to be in their assigned areas at all times unless previously excused by the administration.

During his first year at CVCC, Pittman served as an "on-call" substitute teacher and would report for work only as needed. In his second two years, Pittman served as a "full-time building" substitute teacher and was required to be physically present at the school every day.[3] The only other full-time building substitute teacher at CVCC during this time was a Caucasian female, Fran Galletti, who had been a substitute teacher with CVCC for ten years as of 2003.

Pittman was given a one year, non-renewable substitute teacher contract for each of the two years Pittman was employed as a full-time building substitute teacher. He was also given a one year, non-renewable teacher contract for each of those two years. In order for his teacher contract to take effect, however, Pittman had to first work 60 actual days as a substitute teacher. For the time period represented by the 2003-2004 school year, Pittman was required to fulfill the 60 actual days requirement between August 21, 2003 and November 13, 2003. If the requirement was met during that time period, Pittman's one year teacher contract would then be effective from November 14, 2003 through June 30, 2004.

Under the terms of his teaching contract, Pittman could be assigned to other areas of responsibility as directed by the Superintendent and in accordance with Pittman's certification and/or qualifications. These responsibilities typically included parking lot supervision, and hall or lunch duties.

In early September 2003, Pittman drafted a memo to Superintendent Schlachter suggesting

---

[3] CVCC uses both "on-call" substitute teachers and "full-time building" substitute teachers to replace full-time teachers who are absent.

CVCC adopt new parking lot procedures to allow for the early dismissal of certain students to prevent congestion in the parking lot.  Pittman drafted the memo in response to hearing about accidents that had occurred in the parking lot the prior year.  Pittman's suggestion was not adopted as policy by CVCC's Board of Education.

Sometime thereafter, and on several occasions between September and October 2003, Pittman was observed by Principal Rybak dismissing his classes early without prior approval from the administration.  Pittman was also allowing his students to leave five minutes early on days Pittman was assigned to parking lot duties.  The number of times and reasons for the early dismissals between September and October 2003 are in dispute; however, it is not disputed that Pittman would allow his students to leave early in order for Pittman to cover his parking lot duties.[4]

The record indicates Pittman was verbally reprimanded on several occasions, and was also formally put on notice of Principal Rybak's expectations with respect to the early dismissal of students and coverage of a teacher's assigned areas.[5]  The notice was sent by letter to Pittman on October 16,

_____

[4]    Pittman conceded in his deposition that he released his students five minutes early on days when he had parking lot duties, and that Principal Rybak may have observed this.  He also admitted this was not an approved policy of CCVC.

[5]    An affidavit submitted by Principal Rybak attests that Pittman was verbally reprimanded on at least three occasions (September 15, 2003, October 3, 2003, and October 16, 2003) after Principal Rybak observed Pittman allowing his students to be dismissed early.  Principal Rybak's affidavit further attests that Pittman was formally reprimanded in a written letter dated October 16, 2003 as follow-up to a verbal discussion that occurred earlier that day.  Pittman's affidavit does not specifically rebut or admit the verbal reprimands, and concedes that Pittman was formally reprimanded on at least one occasion on October 16, 2003.  Handwritten notes drafted by Pittman on the front of the October 16, 2003 reprimand letter claim, however, that "this is the first time I have heard about one of my classes being dismissed early this school year."

4

2003 as a result of an early dismissal that day.  Pittman's response to the October 16, 2003 letter was handwritten in the margins of the letter.  Pittman wrote "the only times students have been dismissed early is to cover my parking lot duty or in an adjusted schedule."

Pittman also had trouble with some of the teachers at CVCC.  In or around October 2003, Pittman had a confrontation in the parking lot with Fran Galletti, the other full-time building substitute teacher.  As they were walking back into the building from their parking lot duties, Pittman asked Ms. Galletti why she had complained to the administration about Pittman being on the phone in their office.  Ms. Galletti responded that Pittman was not supposed to be on the phone, and Pittman explained his reasons for doing so.  Pittman ended the conversation by stating to Ms. Galletti "well, that is why you are divorced."  Other members of the teaching staff were present in the parking lot to hear the statement made by Pittman.

A final incident occurred on October 17, 2003.  Certain students at CVCC were required to take special testing that day in a conference room.  Pittman was aware of the testing, and of the fact that the class he was supervising was to report to the conference room and be ready for testing by 8:10 that morning.  Between 8:00 and 8:01 a.m., Principal Rybak made an announcement instructing teachers to begin reporting  to the conference room with their students because the doors would close promptly at 8:10 a.m.  At or around 8:08 a.m., Principal Rybak noticed that Pittman and his students were missing.  At 8:09 a.m., Pittman's students were not seated in the conference room, but were just starting to walk into the testing area.

Apparently, a heated discussion then followed between Pittman and Principal Rybak in front of Pittman's students.  Principal Rybak asked if Pittman had heard the announcement that students were to be ready to take the exam at 8:10 a.m., and not walking into the classroom.  Pittman responded by

5

disputing Principal Rybak's observation that his students were late. Pittman directed his students - in front of the faculty and other students - to look at the clock and confirm they were not late.

After Pittman and Principal Rybak argued over whether Pittman's students were late, Principal Rybak instructed Pittman to follow his students into the conference room and to monitor them during the exam. Pittman did not follow this instruction, however, choosing instead to walk away. He stated he was going to talk to Assistant Principal Huml. Pittman did not ensure someone was supervising his students in his absence.

After Pittman walked away, Principal Rybak returned to his office where Pittman approached him. Principal Rybak again told Pittman he should be monitoring his students in the testing area, whereupon Pittman essentially stated - within earshot of other faculty and students - that if Principal Rybak "would do his job as Principal" then Pittman could better do his job. Pittman then proceeded to the testing area.

Later that day, Principal Rybak once again was approached by Pittman - this time in the parking lot. After some comments by Principal Rybak that Pittman should re-evaluate his position at CVCC, Principal Rybak advised Pittman he would be recommending Pittman's suspension, with pay, for insubordination. Principal Rybak did not give a specific reason for the recommendation, but Pittman assumed it was related to the incident earlier that day. Pittman then left CVCC for the day without prior approval for early leave.

Principal Rybak memorialized the October 17, 2003 events with a letter to Pittman reprimanding him for insubordination and recommending to Superintendent Schlachter that Pittman be suspended, with pay, for this reason. Principal Rybak explained in his letter that he found it inappropriate for Pittman to question his abilities in public. Principal Rybak gave no reason for his recommendation other

6

than insubordination.

Pittman also memorialized his version of the events of October 17, 2003 in a report directed to Superintendent Schlachter.  The report was dated October 18, 2003, and it outlined the events that occurred before, during, and after the confrontation at the testing center.  Pittman did not complain of any other problems he might be having with the administration or the faculty in his report.  Specifically, he did not claim that the confrontation with Principle Schlachter and/or the treatment he received from Principal Schlachter was racially motivated or harassing.

Pittman was eventually put on a 10-day suspension, without pay, for what was classified as two separate incidences of insubordination.  The suspension went into effect following an October 22, 2003 administrative hearing Pittman attended.  At the hearing, and also in a written memo, Pittman raised several concerns regarding his job assignments at CVCC and his belief that other teachers were "watching and reporting on him" because they did not think Pittman liked his job.  Pittman, however, did not express any concerns about racial discrimination during the hearing.  He also did not complain or allege - at least not at this time - that he had been subjected to harassment of any type at CVCC.

On October 27, 2003, Pittman received a letter from Superintendent Schlachter informing Pittman that Superintendent Schlachter would be recommending a period of suspension, without pay, to the Board of Education.  On October 31, 2003, Pittman received a follow-up letter from Superintendent Schlachter advising Pittman the Board of Education had approved Pittman's suspension.  Both letters stated the grounds for the suspension were acts of insubordination on October 16, 2003 and October 17, 2003.  The October 31, 2003 letter further advised Pittman that, although his contract did not provide for any specific rights to appeal, the Board of Education would allow testimony from Pittman at the next Board meeting on November 20, 2003.

Pittman accepted the opportunity to speak with the Board of Education about the decision to suspend him.  At the November 20, 2003 meeting, Pittman once again discussed his concerns about his job duties and his perception that he was "under a microscope" by most staff members.  Again, Pittman did not testify that he had been discriminated against or harassed by anyone at CVCC.[6]  Rather, Pittman advised the Board he believed his suspension resulted from the problems he had been having with Principal Rybak, which he said started after he sent his September 2, 2003 to Superintendent Schlachter expressing concerns about parking lot congestion and suggesting the school adopt an early dismissal program.

Pittman's suspension was upheld by the Board of Education.  Because Pittman's 10-day suspension period occurred between October 31, 2003 and November 13, 2003, Pittman did not meet the "60 actual working days" requirement for his teacher contract to come into effect on November 14,

---

[6]  Pittman never accused the administration or faculty of discriminating against him, or harassing him, on the basis of race at any time *during the disciplinary process*. Pittman also did not request any type of investigation by the Board into any acts of harassment or discrimination.  In fact, Pittman admitted in his deposition that he never filed a complaint of harassment or discrimination of any kind against CVCC with any agency - internal or external - during his employment there.  Pittman alludes in his deposition to certain discussions with Assistant Principal Huml about other staff members' treatment of Pittman.  But Pittman does not produce any evidence that he ever mentioned to Assistant Principal Huml that the alleged treatment by other staff members was racially motivated.  When specifically asked in deposition if he went to Mr. Huml with any type of complaints or grievances of harassment prior to 2003, Pittman stated he did not.  He simply went to "talk" about some of the treatment he received from other teachers.  Moreover, the alleged treatment Pittman mentions throughout his deposition simply was his belief that other teachers and some of the administration were "excluding" him from important "goings on" and that this was somehow a subtle form of discrimination. It appears from the record, therefore, that the first complaint of *racially motivated* discrimination or harassment filed by Pittman occurred *after* the conclusion of his disciplinary proceedings when he purportedly went to the Equal Employment Opportunity Commission for assistance.

8

2003.[7]  Pittman was, therefore, placed back on the list of "on-call" substitute teachers pursuant to his substitute teacher contract.  He was not called back as a substitute teacher at the end of his suspension period.

Pittman has filed suit against Defendants for race discrimination, breach of contract, and wrongful termination in violation of Pittman's right to free speech.  He  contends his suspension was racially motivated and he was, in essence, fired from his employment.

Defendants have filed a Motion for Summary Judgment claiming Pittman's suspension was the result of instances of public insubordination, and Pittman's failure to follow the rules and regulations outlined in the Faculty Handbook.  Defendants contend summary judgment is appropriate because Pittman cannot establish a prima facie case of race discrimination, or retaliation for the exercise of his First Amendment rights.

### Standard of Review

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

---

[7]      There is some indication in Pittman's deposition testimony that even *if* Pittman had not been suspended and was able to work the remaining ten working days of the 60-day requirement period, Pittman still would not have been able to fulfill the requirements for his teacher contract to come into effect.  Presumably, Pittman was deficient by enough working days that even the additional ten working days would not have helped.

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The movant, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*

10

*v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby* (D.C. Cir. 1988), 863 F.2d 1029, 1034).

The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgement. *See Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Fulson*, 801 F. Supp. 1 at 4.

### Discussion

The issue presently before the Court is whether there are any issues of material fact presented by the record that require a trial for resolution. Upon reviewing the evidence in a light most favorable to Pittman, the Court concludes there are not.

### 1. Race Discrimination in Violation of Federal Law[8]

Prior to reviewing Pittman's federal race discrimination claims, a preliminary matter raised by Defendants in their Motion for Summary Judgment must be addressed by the Court; namely, which Defendants are subject to personal liability.  The Court finds as a matter of law that Pittman's claims in Count I of his Complaint can only be brought against CVCC.  The individual defendants, Principle Rybak and Superintendent Schlachter, have valid defenses against liability for Pittman's race discrimination claims.

An individual employee or supervisor, who does not otherwise qualify as a statutory "employer" for purposes of federal civil rights law, may not be found personally liable under Title VII of the Civil Rights Act of 1964.  *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997); *see also Czupih v. Card Pak Inc.*, 916 F. Supp. 687, 689-91 (N.D. Ohio 1996).  Courts have found that supervisors, even when the law could consider them an employer's agent and thus a statutory "employer" for purposes of liability, are not personally liable under Title VII and similar state laws.  *Wathen*, 115 F.3d at 405-06.  Principle Rybak and Superintendent Schlachter admittedly were Pittman's "superiors," but they do not qualify as statutory "employers" for purposes of federal civil rights laws.

There is also a limitation on what federal civil rights claims Pittman can bring against CVCC.  As an arm of the State, CVCC is immune from claims brought by Pittman pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  CVCC's immunity stems from the State's Eleventh Amendment immunity.  A plaintiff

---

[8]     Pittman has not identified under which federal statute he brings Count I of his Complaint ("racial discrimination under federal law").  He does, however, state in Paragraph 1 of the Complaint that jurisdiction is invoked pursuant to 42 U.S.C. §§ 1981 and 1983, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and § 42 U.S.C. 2000, *et al.*  Since Pittman's burden of proof to establish a prima facie case of race discrimination is the same under any of these federal statutes, the Court need not try to decipher Pittman's intent.

is precluded from directly suing a State in federal court on these claims.  *See Quern v. Jordan*, 440 U.S. 332, 350 (1979)(holding that § 1983 does not override a State's Eleventh Amendment immunity); *see also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)(recognizing that claims against a State under § 1981 are barred by the Eleventh Amendment).[9]

In summary, Pittman is allowed to proceed against CVCC on claims brought under Title VII[10] and similar federal civil rights laws, and is allowed to proceed against Principle Rybak and Superintendent Schlachter on claims brought under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  With these limitations in place, the Court will analyze and discuss the merits of Defendants' Motion for Summary Judgment.

### a.  Evidence of Race Discrimination

Defendants point to what they believe are several fatalities to Pittman's claims of race discrimination, including that: (1) Pittman has not presented any direct evidence of race discrimination; (2) there is no evidence Pittman was replaced by someone outside the protected class; (3) there is no

---

[9]     Presumably acknowledging this, Pittman has only pled a § 1983 claim against the individual defendants.

[10]    The record is unclear as to whether Pittman first exhausted his administrative remedies by filing a claim with the Equal Employment Opportunity Commission ("EEOC"), which he is required to do prior to bringing legal claims under Title VII and related civil rights laws.  Pittman's deposition testimony makes it clear he did not file a complaint of racial discrimination or harassment with any agency prior to - or during - his disciplinary proceedings.  He does, however, allege at Paragraph 5 of his Complaint that he "requested his right to sue notice" from the EEOC on or about November 15, 2004.  But nothing in the record clarifies whether Pittman *actually filed a claim in the first instance* with the EEOC.  In any event, Defendants have not disputed the allegation in Paragraph 5 of the Complaint that Pittman "exhausted his administrative remedies," nor have Defendants filed a Motion to Dismiss for failure to exhaust administrative remedies.  So, while the record may not be helpful on this point, because of the Court's other conclusions - and in light of the fact that Defendants have not disputed (or raised) the issue of exhaustion of administrative remedies - the Court need not resolve this discrepancy.

13

evidence Pittman was treated differently than similarly situated, non-minority employees; and, (4) the reason for Pittman's suspension was both legitimate and non-discriminatory. Each of these arguments will be discussed in turn.

### i. Direct Evidence of Race Discrimination

It is well-settled that a plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id.*

Direct evidence is evidence which, if believed, *requires* the conclusion that unlawful discrimination was a motivating factor in the employer's action. "[D]irect evidence proves the existence of a fact without any inferences or presumptions." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 1994)(internal citations omitted). Under the direct evidence approach, once the plaintiff introduces evidence that the employer terminated him "because of" his race or other protected status, the burden of persuasion shifts to the employer to prove it would have terminated the plaintiff even if it had not been motivated by discrimination. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994)(citing *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 244-45).

Pittman's deposition testimony indicates he is proceeding under a circumstantial evidence approach rather than a direct evidence approach:

> **Q:     No one ever said that you were being suspended because of**
> **your race; is that correct?**
>
> **A:     That's correct.**

When asked how he arrived at the conclusion he was being harassed and discriminated against based upon

14

his race, Pittman stated it was:

> **A:**    **More subtle.  More of an undertone of you're not good enough and we don't like you.  It was subtle.  It wasn't outwardly said.**

This Court is, therefore, directed by Plaintiff's own testimony to analyze his claims under a circumstantial evidence approach rather than searching the record for direct evidence of discrimination.

### ii.  Circumstantial Evidence of Race Discrimination

Under the circumstantial evidence approach, Pittman must satisfy the burdens of proof outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To avoid summary judgment, he must first make out a prima facie case of race discrimination.  To make out his prima facie case, Pittman must demonstrate: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the job; and (4) he was replaced by someone outside the protected class or treated differently than similarly situated, non-minority employees for the same or similar conduct. If Pittman successfully proves his prima facie case, the burden then shifts to Defendants to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *Tomblin v. Local 496*, 20 F. Supp. 2d 1136, 1144 (N.D. Ohio 1998)(citing *Ang v. Procter & Gamble Co.* (6th Cir. 1991), 932 F.2d 540, 548).  Only the burden of production shifts to Defendants; at no time do they need to persuade the trier of fact they were actually motivated by the proffered reasons.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

When a defendant asserts a non-discriminatory reason for its actions, it is then incumbent upon the plaintiff to establish those reasons are merely pretexts for acts of discrimination.   *Tomblin*, 20 F. Supp. 2d at 1148 (citing *McDonnell Douglas*, 411 U.S. at 804-05).  At all times, the burden of persuasion remains with the plaintiff to establish that the adverse employment action was the result of

15

unlawful discrimination. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502). To show pretext, a plaintiff must be able to demonstrate **both** that the "reason was false, and that discrimination was the real reason." *Id.* (citing *Hicks*, 509 U.S. at 515)(emphasis added). The effect of an employer's non-discriminatory explanation is to convert the inference of discrimination based upon the plaintiff's prima facie case from a mandatory one, which the fact finder *must* draw, to a permissive one, which the fact finder *may* draw if it finds that the employer's explanation is "unworthy" of belief. The fact finder must have a sufficient basis in the evidence for rejecting the employer's explanation, however, and it is plaintiff's burden to come forward with that evidence. *Id.* (citing *Hicks*, 509 U.S. at 519).

### b. "Similarly Situated" Non-Minority Employees Treated More Favorably[11]

Pittman and CVCC are in agreement that the first three prongs of the *McDonnell Douglas* test have been met (i.e., Pittman is a member of a protected class, he is qualified as a substitute teacher[12], and he suffered an adverse employment action). The only prong in dispute is whether Pittman was "treated

---

[11] An affidavit submitted by Principal Rybak dated February 15, 2006 attests that, since Pittman's suspension in 2003, CVCC has not filled the full-time building substitute teacher position left vacant by Pittman. Pittman offers no evidence to rebut this. Rather, he claims that comparable, non-protected employees received better treatment for what Pittman subjectively believes to be the same or similar conduct. The Court, therefore, will only address whether similarly situated, non-minority employees were treated more favorably than Pittman for the same or similar conduct.

[12] Pittman has attached to his Brief in Opposition certain Exhibits which are various evaluations and observations of Pittman's work performance which predate his September 2003 memo to Superintendent Schlachter. He claims these Exhibits show Pittman was an employee recommended for continued employment and otherwise an acceptable employee. The Court need not debate the evidentiary value of these Exhibits, however, since neither party disputes that Pittman was qualified for his position as a substitute teacher. The issue before the Court is whether the events *following* these evaluations, and Pittman's ultimate suspension, raise the specter of racial discrimination.

16

differently than similarly situated, non-minority employees for the same or similar conduct." Pittman also claims CVCC cannot prove the legitimacy and non-discriminatory nature of the justification it gave to Pittman for the adverse action taken against him.

Within the context of disciplinary action, when a plaintiff is claiming race discrimination on the theory that similarly situated, non-minority employees were treated more favorably "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Hardman v. The University of Akron*, 100 F. Supp. 2d 509, 517 (N.D. Ohio 2000)(citing *Ercegovich v. Goodyear Tire & Rubber Co.* (6th Cir. 1998), 154 F.3d 344, 352); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).  The Sixth Circuit has expressly required that a plaintiff show that the alleged comparable non-minority employee is similarly situated in all respects before it will analyze the discrimination plaintiff's treatment and the treatment afforded to the non-minority employee. *Mitchell*, 964 F.2d at 583 (quoting *Stotts v. Memphis Fire Dept.* (6th Cir. 1988), 858 F.2d 289).

Reviewing the evidence in a light most generous to Pittman, the Court finds there is not a genuine issue of material fact for trial on the third prong of the *McDonnell Douglas* prima facie test.  Pittman has not established a factual issue as to whether the same or similar acts were undertaken by similarly situated, non-minority employees such that the Court can compare the treatment afforded to Pittman and the treatment afforded to the non-minority employees.

Pittman admitted in his deposition he could not think of a single act of public insubordination by any other teacher - substitute or otherwise.  When specifically asked about any incidences where Fran Galletti, the only other full-time building substitute teacher, questioned the authority or abilities of

Principal Rybak in front of staff or students, Pittman responded:

> **Q:** **... To your knowledge, did Ms. Galletti ever question the authority of Mr. Rybak in front of other staff or students?**
>
> **A:** **Yes.**
>
> **Q:** **Can you explain?**
>
> **A:** **She was always voicing her opinion and talking to him in what I thought was inappropriate or Mr. Huml or Ms. Grubb, but they I guess had built up a relationship over the years that it - nothing became of it.**
>
> **Q.** **Any specific incidences come to mind?**
>
> **A:** **No, but I do know that there were incidents where she wasn't happy with doing a certain thing.  And she did make it known and questioned certain things, but nothing became of it.**
>
> **Q:** **But you can't think of anything specific then?**
>
> **A:** **No.  But there were - no.**

At best, this testimony establishes that Fran Galletti was not timid about voicing her opinions and that she - like most employees - was not always happy with some of her duties or assignments.  It does not, however, establish she ever publicly called into question Principal Rybak's abilities "to do his job" as Principal.  It does not even establish she ever "inappropriately" voiced her opinion to Principal Rybak in front of other faculty or students.  Bust most relevant to these facts, Pittman's evidence wholly fails to establish that Ms. Galletti openly defied Principle Rybak in public *and involved her students* in her insubordination.  Whatever Pittman subjectively believed about the manner or tone in which Ms. Galletti spoke to Principal Rybak about her assignments, the evidence simply does not show any acts of disobedience, defiance, or insubordination on the part of Fran Galletti in front of other faculty or staff and/or involving her students.

18

Pittman was also asked about instances where teachers (other than Fran Galletti) may have questioned the authority of Principal Rybak:

> **Q:**    **But you can't give me a single specific instance that you recall where somebody questioned his authority?**
>
> **A:**    **No.  And I may recall later.  And if I recall, I'll jot it down. And I may have some stuff in my notes at home.[13]**
>
> **Q:**    **But as you sit here today, you can't recall anything?**
>
> **A:**    **No.**

Finally, Pittman was questioned about any occasions where Fran Galletti and/or other teachers publicly refused an instruction from Principal Rybak:

> **Q:**    **... is there an instance in which [a] teacher refused to follow the instruction that was given to them?**
>
> **A:**    **Indirectly they did, but then Mr. Rybak would reiterate that that is what he needs them to do.**
>
> **Q:**    **And would they do it?**
>
> **A:**    **Yes.**
>
> **Q.**    **So as we sit here today, you can't think of any instance where they didn't follow his instructions?**
>
> **A:**    **I can think of one.**
>
> **Q:**    **Which is?**
>
> **A:**    **He asked one teacher not to do something, and they did it again.  And he talked to them and told them I told you not to do that.  And they said, okay, it won't happen again.  I won't do it again.  And that was the end of it, and they never did it**

---

[13]    There is no evidence in the record that Pittman is in possession of any personal notes concerning instances of public insubordination by other teachers at CVCC, and Pittman has not introduced any such "notes" into evidence.

again.

Q:     **Do you recall who that teacher was?**

A:     **I don't recall if it was a teacher or an administrator, but I have it in my notes.**

Q:     **Specifically, that teacher wasn't Fran Galletti?**

A:     **No, No.**

Pittman's deposition testimony merely provided a scintilla of evidence that - at best - created a "metaphysical doubt as to material facts" regarding whether there were acts of comparable seriousness undertaken by other employees.  This, of course, would be insufficient as a matter of law to defeat a motion for summary judgment. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  At worst, his testimony was no response at all and would entitle the moving party to an automatic grant of summary judgement. *Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997).

To rehabilitate his deposition testimony, however, Pittman attaches an affidavit to his Brief in Opposition that alleges - for the first time - instances of a failure to follow procedures and/or public questioning of assignments by other teachers at CVCC.[14]  His affidavit does not contain an affirmation that the information contained in the affidavit is based on Pittman's own personal knowledge. *See* Fed. R. Civ. Pro. 56(e).  The affidavit also does not set forth specific facts regarding the alleged acts of failure to follow procedures and/or public questioning of assignments by the teachers identified in his affidavit.  For instance, Pittman does not set forth any dates of when these events occurred.  Pittman broadly contends the teachers identified in his affidavit "often questioned," or were "always late," or "repeatedly

---

[14]     Pittman was asked numerous times in deposition for this information - and a document request was made on the record at his deposition - but Pittman, up until the moment Defendants filed their Motion for Summary Judgment, claimed to be unable to recall and/or locate the information.

failed or forgot" to do certain things. Whether these events occurred before or after Pittman's suspension is a highly relevant fact Pittman has omitted.

Pittman also does not set forth any information with respect to the circumstances under which the alleged acts of failure to follow procedure and/or publicly questioning assignments occurred. Nor does he identify the supervisor(s) for the teachers discussed in his affidavit, what position(s) those teachers held, what their primary duties were, and how long they were employed by CVCC - again, all highly relevant facts. Pittman's affidavit - on its face - is contrary to the settled rule that a party opposing summary judgment cannot point to vague, broad allegations but must instead point to specific facts in the record. Even without these deficiencies, however, Pittman's affidavit is not sufficient to establish a prima facie case of race discrimination.

According to the uncontested affidavit of Superintendent Schlachter, both Chris Stricklett and Robert Braud were full-time teachers at the time Pittman served as a substitute teacher. Pittman himself has produced evidence that Ms. Galletti had been a substitute teacher with CVCC for ten years as of the 2003-2004 school year, whereas Pittman had been a three-year substitute teacher who only served as a full-time building substitute for two years. Ms. Galletti's service recognition award, which Pittman has attached to his Brief in Opposition, illustrates that she was among thirty-five other employees recognized for their service to CVCC. Pittman was not among the employees recognized.

It is arguable that none of these employees are similarly situated to Pittman because they were full-time employees with different supervisors and/or with much longer tenure at the school. But the Court need not reach the question of whether they are not similarly situated based upon their *status* because the Court easily finds they are not similarly situated in light of their *behavior*, based upon Pittman's own description of that behavior.

21

Pittman points to the following conduct of the teachers identified in his affidavit:

    (1)    A significantly more senior substitute teacher "often questioning her assignments" to Principal Rybak in the presence of others;

    (2)    A full-time teacher "always being late entering grades" and whose student allegedly shot himself with a nail gun; and,

    (3)    A full-time teacher who "repeatedly failed or forgot to turn in his daily attendance reports."

In addition to the lack of specific facts noted *infra*, Pittman's identification of these events does not establish evidence of acts of comparable seriousness.

First, while Pittman alleges the teachers identified in his affidavit failed to follow instructions or procedures, he has not produced evidence that any of those teachers have ever been in open and obvious defiance of Principal Rybak's instructions by *publicly walking away from an express directive*.  Second, Pittman has not produced any evidence that the teachers identified have ever publicly confronted Principal Rybak and told him he was "not doing his job."  Third, Pittman has not produced any evidence that the teachers identified have ever publicly questioned Principal Rybak's authority and involved their students by *asking their students to confirm the Principal was not speaking the truth about a particular matter*. Finally, Pittman has not produced any evidence the other teachers identified were not in the area assigned to them (a testing area or otherwise) when they were supposed to be, or that they allowed their students to leave early so they could cover other duties.

Even weighing the evidence in a light most favorable to Pittman, the Court has no difficulty finding that Pittman has failed to establish that there were non-minority employees at CVCC who engaged in the same or similar conduct such that the Court could analyze the treatment of those employees against the treatment of Pittman for purposes of a race discrimination claim. *Fulson*, *supra*, 801 F. Supp. 1 at 4.  Rather than introducing specific facts, Pittman points to his own vague allegations

and subjective beliefs and claims this is probative evidence of discrimination.  It is not, and Pittman has, quite simply, failed to satisfy an essential element of the *McDonnell Douglas* prima facie case.

### c.  Legitimate, Non-Discriminatory Reason for Adverse Action

Assuming, *arguendo*, that Pittman could establish a prima facie case of race discrimination utilizing the circumstantial evidence approach, he has not shown how Defendants' articulated reasons for his suspension were a pretext for intentional race discrimination.[15]

The Sixth Circuit has set forth three ways for a plaintiff to meet his/her burden of showing pretext and thereby create a legitimate question for the jury in the face of an employer's articulated non-discriminatory reason for its actions.  First, the plaintiff can show the proffered reason is factually false.  Second, the plaintiff can show the proffered reason was not sufficient by itself to justify the adverse action taken against the plaintiff.  Third, the plaintiff, while not disputing the truth of the proffered reason, can present evidence to show the proffered reasons did not actually motivate the adverse action taken. *Tomblin*, 20 F. Supp. 2d at 1148 (citing *Manzer v. Diamond Shamrock Chemicals Co.* (6th Cir. 1994), 29 F.3d 1078, 1084).

Under the third scenario, the plaintiff must present some proof, beyond a prima facie case, of discriminatory animus. *Tomblin*, 20 F. Supp. 2d at 1149 (citing *Manzer*, 29 F.3d at 1084).  Each of these means presents a sufficient evidentiary basis to create a "suspicion of mendacity" for the fact finder to

---

[15]  Pittman argues at Page 3 of his Brief in Opposition that "defendants, while articulating a reason for such adverse action, cannot show that such reason is legitimate and that such reason is [not] mere pretext."  But Pittman ignores the well-settled principle that it remains at all times the burden of the *plaintiff* to persuade the fact finder the defendant's reasons are merely a pretext for discrimination. *Tomblin v. Local 496*, 20 F. Supp. 2d 1136, 1148 (N.D. Ohio 1998)(citing *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502).  At no time does a defendant have to *prove* their reasons are legitimate and non-discriminatory; a defendant merely has to *articulate* a legitimate, non-discriminatory reason.

infer an illegal motive and reject the employer's proffered explanation.  *Id.* (citing *Wheeler v. McKinley Enters.* (6th Cir. 1991), 937 F.2d 1158, 1162).

Defendants have articulated the reasons for Pittman's suspension as being related to his failure to follow CVCC rules and policies, and two instances of insubordination.  They have produced evidence in the form of affidavits and deposition testimony in support of their articulated reasons for suspending Pittman.  Indeed, Pittman conceded in his deposition that: (1) he allowed his students to leave early on days he had to cover the parking lot; (2) he knew this was not an approved CVCC policy; (3) he asked his students to look at a clock in the testing area to confirm they were not late, which was contrary to what Principle Rybak had previously stated in their presence; (4) he walked away from an assigned area (monitoring his students during testing) without approval from the administration; (5) he stated to Principle Rybak, within hearing distance of other faculty members and students, that if Principle Rybak "would do his job," then Pittman could better do his job; and (6) this was not an appropriate thing to say.  Based on this record, the Court finds as a matter of law that the each of the reasons articulated by Defendants for Pittman's suspension have a basis in fact.

It was therefore incumbent upon Pittman to come forward with evidence explaining how Defendants' reasons were, in fact, a pretext for intentional discrimination.  Because the Court finds Defendants reasons for suspending Pittman have a factual basis, Pittman could have met his burden by showing that one of the other two methods for establishing pretext applies: (1) that the claimed acts of policy infractions and insubordination were - by themselves - insufficient to justify a suspension; or, (2) that Defendants were not motivated by the claimed policy infractions and insubordination when they suspended Pittman, but were instead motivated by discrimination.

Rather than doing this any of this, however, Pittman primarily focuses on explaining his behavior.

His theory appears to be that if he had legitimate reasons for doing what he did, then Defendants' reasons for suspending him *must* be a pretext for discrimination.[16]   Alternatively, Pittman attaches statistics from the Ohio Civil Rights Commission which he claims show a lack of African American teachers at CVCC. This evidence, Pittman contends, must lead the fact finder to the conclusion that Defendants' real reasons were motivated by race.  Pittman is incorrect on both points.

With respect to Pittman's explanation of his behavior, Pittman argues at length in his Brief that he had legitimate reasons for allowing his students to leave early.  First, he claims he was unable to simultaneously cover his parking lot duties and remain in his prior assigned area until the students were released.  Second, he claims certain students were on a "rotating schedule" such that they would be permitted to be released early on certain days, but that Pittman was not always made aware of the schedule.  Setting aside whether or not it was Pittman's responsibility to make himself aware of the "rotating schedule," Pittman's deposition testimony establishes he was aware that dismissing his students early on days he had to cover his parking lot duties was *not* an approved policy of CVCC.  More importantly, if Pittman was unaware of which students were on a rotating schedule then he had no reason to believe his students would be permitted to leave early on the days he excused them.

---

[16]      Pittman also contends, at Page 7 of his Brief in Opposition, that he was "not aware of the specifics of his alleged insubordination" until October 27, 2003 when he received the post-hearing letter from Superintendent Schlachter.  This, in fact, is not true.  Pittman was informed in a letter from Principle Rybak dated October 17, 2003 - five days before Pittman's hearing - that two recent incidences between Pittman and Principle Rybak, as well as specific comments made by Pittman to Principal Rybak, formed the basis of the insubordination claims.  Pittman himself admitted in deposition he assumed the reason for the letter on October 17, 2004 and the claim of insubordination was related to the incident earlier that day.  Just because the acts are not spelled out in detail in letters or other correspondence to Pittman does not mean he would not be aware of the facts which formed the basis for Principle Rybak's belief that Pittman's behavior was unacceptable or inappropriate.

Notwithstanding this, Pittman's argument regarding his inability to cover his parking lot duties and his unawareness of which students were on a rotating schedule ignores the true issues.  As Defendants correctly point out in their Reply Brief, the issue is not whether Defendants were "right" or "wrong" in believing Pittman's actions constituted insubordination.  The true issues are whether Defendants have articulated a legitimate, non-discriminatory reason for suspending Pittman, and whether Pittman has established that Defendants' reasons are a pretext for race discrimination.  While Pittman may believe he had valid reasons for ignoring school policy, this does not change the fact that he permitted his students to be dismissed early without prior approval.  Any excuses offered by Pittman as to why he ignored school policy does not affect the legitimacy of the reasons articulated by Defendants for suspending Pittman.

Similarly unavailing is Pittman's attempt to shift the focus onto Principal Rybak's alleged misconduct.  Pittman argues in his Brief that Defendants focus solely on Pittman's conduct without regard to any inappropriate behavior on the part of Principal Rybak.  But asking whether a supervisor has acted inappropriately in the face of disobedience from an employee is not the correct focus.  While it may not be wise for a supervisor to react defensively to insubordination from an employee, if the conduct of the employee supports the supervisor's reasons for disciplining the employee, then the defendant has articulated a legitimate, non-discriminatory reason for its actions.  Any alleged "inappropriate" behavior by the defendant does not enter into the equation of whether the defendant has met the threshold of articulating a legitimate, non-discriminatory reason for disciplinary action.

As for the statistics Pittman has produced from the Ohio Civil Rights Commission, Pittman has not demonstrated how the statistics show that Defendants' intent, or mind-set, in making the decision to recommend suspending Pittman was to discriminate against Pittman on the basis of race. When utilizing

26

statistics in an employment discrimination case, the plaintiff is obligated to develop that evidence "into useful direct or inferential proof of the defendant's intent."  *See Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).  As *Amini* illustrates, Pittman has not done so here.

In *Amini*, the plaintiff was an Iranian-born Muslim who applied to Oberlin College for the position of Assistant Professor of Mathematics.  He was not interviewed or hired, and he alleged the College engaged in discriminatory practices because: (1) the college never hired an African-American or Mid-Eastern faculty member; (2) the chair of the search committee did not recall reviewing an application from any candidate other than a non-European White; and, (3) a non-white faculty member was hired after the plaintiff filed an EEOC charge.  *Amini*, 440 F.3d at 358-59.

In support of his arguments, the plaintiff produced the racial composition of the Oberlin faculty. The court, however, held:

> The racial composition of the Oberlin faculty does not lead ineluctably to the conclusion that the college considered race when eliminating the plaintiff from consideration for the position for which he applied.  Such statistical evidence at most may constitute circumstantial evidence of discrimination.  *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990).  However, "[f]or statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination."  *Rocha v. Great Am. Ins. Co.*, 850 F.2d 1095, 1101 (6th Cir. 1988)(internal quotes and citation omitted).  The plaintiff's evidence constituted at most an anecdotal report; both parties provided some evidence of Oberlin's hiring practices and the college stated that it had hired faculty members with Iranian, Algerian, Sri Lankan, and Asian lineage.  The plaintiff did not develop this evidence into useful direct or inferential proof of the defendant's intent.

*Amini*, 440 F.3d at 359.

To rebut the defendant's non-discriminatory reason, the plaintiff in *Amini* then claimed that:

> (1)    The college's claim that the person hired was "the individual most likely to succeed as a teacher and researcher at the college" was

27

> insufficient to demonstrate a non-discriminatory reason for hiring, because any employer could use that reason to justify a discriminatory action;
>
> (2)     The college is not entitled to deference in deciding who receives offers for teaching positions because such deference only extends to circumstances of faculty promotion and award of tenure, and would contradict the purposes of section 1981 by allowing educational institutions to engage in discriminatory hiring and promotion;
>
> (3)     He had superior qualifications than the other applicants; and,
>
> (4)     The hiring committee was race conscious in that the college's hiring agents could not recall reviewing applications of candidates with Middle-Eastern-sounding names, they interviewed three non-European white persons and hired a person of his race only after he filed his lawsuit, and a professor reviewing the application of a Central-American woman underlined the statement "Eleanne is a pleasant Hispanic lady."

*Amini*, 440 F.3d at 360.  The court found the plaintiff's circumstantial proof did not refute in any way the college's conclusion that the candidate hired was preferred as a candidate for non-discriminatory reasons, observing:

> The plaintiff has great difficulty accepting the fact that the hiring committee found a younger, less experienced, less published person more likely to succeed in the position than himself, and concludes that some other reason must support the decision than merit alone.

*Id.* at 361.

Similarly, Pittman's attachment of statistics from the Ohio Civil Rights Commission does not establish that Defendants' articulated reasons for suspending Pittman were merely a pretext for discrimination.   Nowhere in Pittman's Brief does Pittman develop this evidence into direct or circumstantial proof of a discriminatory animus.  Pittman fails to even discuss how such statistics show a discriminatory intent either before, during, or after Pittman's disciplinary proceedings and hearings.

28

But most revealing is the fact that the statistics actually *disprove* Pittman's contentions.  Pittman claims in his affidavit he was "the only black teacher" at CVCC.  He also stated in his deposition he "never saw" any other black teachers.  The statistics, however, clearly indicate that there were eight African-American teachers - full-time and substitutes - employed by CVCC during the 2003-2004 school year.  An affidavit submitted by Superintendent Schlachter confirms this.  The fact that Pittman did not "see" them does not mean they were not there.

Pittman does allude to a "subtle" form of discrimination directed towards him by certain teachers and administrative staff at CVCC.  He claims that, because CVCC allegedly sat silently by and allowed such conduct to occur, they must have been motivated by racism in their treatment of him and, therefore, their articulated reason of insubordination must be pretext.  The discrimination is claimed to be in the form of: (1) not being privy to certain conversations between the administration and some of the other teachers; (2) Pittman's belief that other teachers were talking among themselves about important things going on in the school and not always informing Pittman; (3) Pittman's belief that he was being "monitored" by other teachers who then complained to the administration that Pittman was not carrying out his duties; (4) Pittman's belief that he was not always included in things he felt he should be included in that other staff members were made a part of (such as field trips); and, (5) Pittman's belief that the administration allowed other teachers to make "behind the back, false accusations" against him, and did not allow Pittman to confront or respond to the accusations.

Throughout his deposition testimony and his Brief in Opposition, however, Pittman never mentions any of the administrators or teachers he believes took part in this subtle form of discrimination. His deposition testimony confirms he never filed a harassment report, and he never mentioned harassment or discrimination in his correspondence to the administration and the Board of Education during his

29

defense against claims of insubordination. The only evidence that anything was ever mentioned to anyone is Pittman's statement in deposition that he occasionally spoke to Assistant Principal Huml about other teachers' "treatment" of Pittman. He does not claim that he mentioned to Assistant Principal Huml he believed the treatment was harassing or racially motivated. In fact, when asked if he went to Mr. Huml with any type of complaints or grievances of harassment prior to 2003, Pittman stated he did not. He simply went to "talk" about some of the treatment he received from other teachers.

Pittman's harassment, if any, stems from his perception that other people at the school felt Pittman was "not good enough" and did not like him. His beef essentially is with other staff members for reporting him to the administration and/or leaving him out of things. But this is not circumstantial evidence of discrimination on the part of Defendants; it is debatable whether it even amounts to circumstantial evidence of discrimination on the part of Pittman's colleagues. And, if Pittman is attempting to assert some type of vicarious liability - which he has not pled - he fails to cite to any legal source or evidence that could equate the alleged conduct of other teachers to pretext on the part of Defendants.

In short, Pittman's own testimony provides sufficient proof that Defendants' articulated reasons for suspending Pittman had a basis in fact. Pittman has not shown - by affidavit or otherwise - that school policy infractions and insubordination would, by themselves, be insufficient to justify the suspension of a similarly situated, non-minority employee. And Pittman's introduction of the employment statistics for CVCC in 2003 fails to show that school policy infractions and insubordination did not actually motivate Defendants when they suspended him. Because Pittman has not established a prima facie case of race discrimination, and because there is not a genuine issue of material fact to dispute that Defendants' reasons for suspending Pittman were legitimate and non-discriminatory, Pittman's claims of race

discrimination fail as a matter of law.

### 2. Conspiracy under Color of Law to Deprive the Right to Free Speech[17]

In the last sentence of Paragraph 4 of Pittman's Complaint, it is claimed: "The individual defendants used their respective official positions to deprive and curtail plaintiff's First Amendment rights." Count IV of the Complaint elaborates:

> [T]he defendants Rybak and Schlachter were acting under color of law, when on October 27, 2004, they conspired to suppress plaintiff's first amendment right of free speech by suspending him and subsequently terminating him for speaking out regarding the unfair imposition of duties on plaintiff and for his criticizing false accusations against plaintiff by such officials.

A review of the Complaint and Pittman's deposition has not uncovered any allegation that the individual defendants were motivated by intentional race-based discrimination in their conspiratorial actions. The Court will, therefore, analyze Pittman's conspiracy claim as an allegation that Principle Rybak and Superintendent Schlachter conspired to deprive Pittman of his rights, privileges, and/or immunities secured by the First Amendment of the United States Constitution. *See* 42 U.S.C. § 1983.[18]

The Sixth Circuit has observed that "[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim under § 1983." *Jackson v. Madery*, 158 Fed. Appx. 656, 659 (6th Cir.

---

[17]  Pittman again fails to identify the federal statute under which he brings Count IV of his Complaint.

[18]  If Pittman intended to plead that the alleged conspiracy between the individual defendants was motivated by a racially discriminatory animus which was intended to deprive him of equal protection of the laws, Pittman could have brought his claims under 42 U.S.C. § 1985. Pittman has not invoked the Court's jurisdiction pursuant to 42 U.S.C. § 1985, however, but has instead invoked jurisdiction pursuant to 42 U.S.C. § 1983.

31

2005)(citing *Gutierrez v. Lynch* (6th Cir. 1987)*, 826 F.2d 1534, 1538). Because a plaintiff rarely will be able to offer direct evidence in a conspiracy case of an express agreement among the conspirators, circumstantial evidence may provide adequate proof of conspiracy. *Weberg v. Franks,* 229 F.3d 514, 528 (6th Cir. 2000).

The Southern District of Ohio has described the elements of proof for a civil conspiracy as follows:

> A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "circumstantial evidence may provide adequate proof of conspiracy." Absent the testimony of a co-conspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives.

Coon v. Froehlich, 573 F.Supp. 918, 922 (S.D.Ohio 1983)(internal citations omitted).

To bring a First Amendment claim under § 1983, Pittman must prove that: (1) his speech was constitutionally protected; and, (2) his speech was a "substantial" or "motivating" factor in the defendants' decision to recommend the suspension of Pittman from his teaching duties. Principle Rybak and Superintendent Schlachter can then rebut any such evidence by establishing they would have made the same decision even without the protected speech. *Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

A discharge from employment implicates the First Amendment only if the plaintiff's speech can be considered "protected speech," meaning it could be "fairly characterized as constituting speech on a

32

matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983).  For speech to be a matter of public concern, it must be related to political or social concerns of the community.  *Id.*  In the normal course of events, the First Amendment does not protect a public employee who speaks as an employee on matters of personal interest.  *Id.* at 147.  Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed from the whole record.  *Id.* at 147-48.  The initial inquiry into determining whether a public employee's speech is a matter of public concern is a question of law for the Court to decide.  *Rankin v. McPherson*, 483 U.S. 378, 386 n.9 (1987); *see also Connick*, 461 U.S. at 148 n.7.

Applying these standards, the Court finds there is no possibility a jury could infer from the record that Principle Rybak and Superintendent Schlachter had a "meeting of the minds" and thus "reached an understanding" to achieve a conspiratorial objective to deprive Pittman of his First Amendment rights.  First, Pittman has not even pled these elements in his conspiracy count.  Second, Pittman has not produced a single shred of evidence that - prior to Principle Rybak's recommendation of suspension - Superintendent Schlachter was involved in, or aware of, the events preceding Principal Rybak's recommendation such that the two defendants could be said to be acting in concert to "set Pittman up" for a suspension - thereby suppressing his speech.  Most importantly, however, Pittman *does not address whatsoever his conspiracy claims in his Brief in Opposition* to Defendants' Motion for Summary Judgment.

There is an utter lack of specific facts from Pittman regarding what activities the individual defendants engaged in which Pittman claims constituted a "conspiracy."  In fact, the only information to be gleaned from the record is Pittman's deposition testimony, and it is of no help to Pittman.  Pittman admitted throughout his deposition that he never brought any of his concerns to Principle Rybak and

Superintendent Schlachter, at least as they related to "the unfair imposition of duties on plaintiff and for his criticizing false accusations against plaintiff" - which is the basis for Pittman's speech suppression claim. The Court is not required to guess at what actions potentially evidence a "meeting of the minds" or an "understanding" on the part of the individual defendants, or how and when the individual defendants "acted in concert." Pittman had the burden of establishing these elements of a conspiracy, and he has failed to do so.

Even if Pittman *had* pointed to a scintilla of evidence regarding a conspiratorial objective on the part of Principle Rybak and Superintendent Schlachter to deprive him of his First Amendment rights, the Court finds as a matter of law that the speech Pittman accuses the individual defendants of suppressing was on matters of purely private concern. Pittman's suspension and alleged termination, therefore, did not implicate the First Amendment and the Court need not dissect the employer's actions for the reasons established by the Supreme Court in *Connick*.

Prior to a discussion of *Connick*, however, it is worth noting that the Supreme Court has issued a very recent decision addressing a Section 1983 claim filed by a public employee based upon speech made in the workplace. Although the parties focus on *Connick* in their briefing, the Supreme Court's recent holding on this issue merits discussion.

In *Garcetti v. Ceballos*, 126 S. Ct. 1951 (May 30, 2006), the plaintiff was a deputy district attorney who was asked by defense counsel to review a criminal case where it was alleged that the affidavit police used to obtain their search warrant was inaccurate. *Id* at 1955. The plaintiff concluded that the affidavit contained serious misrepresentations, and he relayed these findings to his supervisors. He then followed up with a memorandum recommending dismissal of the case. *Id.* at 1955-56. After making the dismissal recommendation to his supervisors and testifying at a hearing to challenge the

34

warrant, the plaintiff was reassigned to other duties, transferred to another courthouse, and denied a promotion. *Id.* at 1956. He filed a 42 U.S.C. § 1983 suit, claiming he was retaliated against for engaging in protected speech. *Id.*

> The Court noted:

> > The controlling factor in [plaintiff's] case is that his expressions were made pursuant to his duties as a calendar deputy ... That consideration - the fact that [plaintiff] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case - distinguishes [plaintiff's] case from those in which the First Amendment provides protection against discipline.

It then held:

> > [W]hen public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Garcetti*, 126 S. Ct. at 1959-60.

Although some legal analysts appear to be interpreting *Garcetti* as holding that statements made by public employees will <u>never</u> be protected if the employee is acting within the scope of his or her employment while making the statements, this Court interprets *Garcetti* more narrowly. The preliminary analysis is one of "job relatedness." If the public employee's *speech* was required by his or her job, then *Garcetti* applies and the statements are not protected speech. If the speech, however, is not specifically job-related, then the statements are reviewed under a traditional *Connick* analysis.

In the case of Pittman's speech, if Pittman was required as part of his job duties to write a memo about parking lot safety issues, *Garcetti* would apply and any concerns expressed in the memo about parking lot safety would not give rise to a viable claim for First Amendment protection. Similarly, if Pittman was required to discuss parking lot safety issues with his students while teaching, *Garcetti* would

35

apply and any concerns expressed to students about parking lot safety made while teaching would not be protected.

It is arguable, therefore, that, at least to the extent Pittman's speech related to required parking lot duties, the Supreme Court's decision in *Garcetti* would be determinative and bar his claims without further analysis.  Because this Court finds, however, that, even under the more traditional analysis dictated by *Connick* - which was not overruled by *Garcetti* - none of Pittman's speech in this area was on a matter of public concern, it need not resolve further questions about the scope of *Garcetti*.

In *Connick, infra*, the plaintiff was an Assistant District Attorney who was terminated for what she believed was an attempt to suppress her first amendment right to free speech.  Prior to her termination, the plaintiff was informed she was being considered for a transfer to another division of the criminal court.  The plaintiff strongly opposed the transfer, and made it known to her supervisors.  She also circulated a questionnaire to her colleagues concerning their views on the office transfer policy, their confidence and trust in their supervisors, their level of office morale, their views on the need for a grievance committee, and whether they felt pressured to work on political campaigns. The plaintiff was told she was being terminated for failing to accept a transfer, and for insubordination.  *Connick*, 461 U.S. at 1686-87.

A majority of the Supreme Court found Connick's speech to be personal to her and unrelated to any matter of public concern.  The Court expressly rejected Connick's conclusion that her speech related to the evaluation of the performance of a public official, and thus of broader concern.  Rather, the Court held that plaintiff's speech was concerned only with an internal office policy with which she took issue - i.e., her own transfer.  *Connick*, 461 U.S. at 1694.

In Pittman's response to Defendants' Motion for Summary Judgment, he has shown nothing

36

which indicates that protected speech, rather than speech regarding a personal grievance like that in *Connick*, is at issue here. Pittman alleges in his Complaint he spoke out against "the unfair imposition of duties on plaintiff" and against "false accusations against plaintiff." He conceded in his deposition that these concerns were solely personal. He also admitted: (1) he was not speaking out on behalf of his fellow employees; (2) he never spoke to either Principal Rybak or Superintendent Schlachter about these concerns; and, (3) he spoke only to Assistant Principal Huml.

Pittman's speech did not implicate the First Amendment because it was admittedly on matters that had an affect only on Pittman - his concern that he was being assigned additional duties not in his job description, and his concern that other teachers were keeping him under a "microscope." Pittman's concerns were never shared with the public, nor did he attempt to determine if others had similar concerns and speak publicly about it on their behalf. His deposition testimony also reveals there could not possibly have been a conspiracy between Principal Ryback and Superintendent Schlachterk on this particular speech, since Pittman very clearly stated he never once complained to them about his job concerns; he complained only to Assistant Principle Huml. In essence, Pittman's deposition testimony reveals he complained to an administrator who had no part in his suspension on matters of purely personal concern.

In a thinly disguised attempt to rehabilitate his deposition testimony, Pittman - for the first time in his Brief in Opposition, rather than by affidavit - claims he was terminated because he spoke out about "safety" and "congestion" in the school parking lot. Even if, as discussed above, claims premised on this speech were not barred by *Garcetti*, they are still inadequate to state a claim under the First Amendment. This is so for the simple reason that Pittman does not tie the adverse employment action about which he complains - his suspension - to that speech. Pittman concedes that his suspension arose from his

altercation with Principle Rybak.  There is no evidence to the contrary anywhere in the record.

For all of these reasons, Pittman has failed to properly plead, or support, a conspiracy claim that implicates the First Amendment under 42 U.S.C. § 1983.

### 3.  Pendent State Law Claims

Pittman also brings claims under state law for violations of Ohio Revised Code §§ 4112.02, 4112.99 and 4113.52; as well as a common law claim for breach of contract.

With respect to Pittman's claims under Section 4112 of the Ohio Revised Code, these claims are directly related to his allegations of race discrimination.  Because it is well-settled in Ohio that the standard for state law discrimination claims asserted under Section 4112 of the Ohio Revised Code is the same as the standard for federal discrimination claims asserted under Title VII and related civil rights statutes[19], the Court's analysis of Pittman's claims under Title VII applies with equal force and effect to his state law claims.  Applying the burden-shifting analysis of *McDonnell-Douglas* to Pittman's state law discrimination claims, therefore, yields the exact same results as when applied to his federal discrimination claims and summary judgment is again appropriate.

Finally, Pittman's state law claim for breach of contract is based upon an assertion in Paragraph 12 of the Complaint that "the actions of defendant in suspending and then terminating his employment and in failing to appoint him to any of the positions available for transfer breached plaintiff's contract with defendant."  Pittman's only argument in his Brief in Opposition to support this claim is his contention that, even if Defendants' suspension was legitimate, somehow Defendants "should have" allowed Pittman

---

[19]     *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196 (1981); *see also Newsom v. Board of Educ. of Xenia City School Dist.*, 59 Fed. Appx. 716, 2003 WL 856972, 175 Ed. Law Rep. 15 (6th Cir. 2003).

to serve his suspension *after* November 13, 2004 so that Pittman could meet the 60-day requirement for his teaching contract to go into effect.

Assuming for the sake of Pittman's argument that Pittman would have been able to meet the 60-day requirement by adding the ten days that were lost during his suspension - an issue which the record makes questionable - Pittman cites to no contractual provision that imposes this obligation upon Defendants.  Pittman also does not dispute that Defendants, by contract, had the right to discipline him for legitimate reasons.  Because Pittman has not pointed to any issue of material fact for the jury on his breach of contract claim, summary judgment is appropriate on this last remaining claim.

## Conclusion

In light of the foregoing, it is

ORDERED THAT Defendants' Motion for Summary Judgment (Doc. No. 9) is granted on all

Counts in Plaintiff's Complaint, including the Counts containing pendant state law claims.

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: August 25, 2006**